Case No. 251727, Laurel Hill Mgmt Services Inc. et al. v. LA-Z-BOY Inc. et al. Oral argument not to exceed 15 minutes per side. Mr. Stieglitz, you may proceed for the appellants. Good morning, Your Honors. May it please the Court. My name is Jonathan Stieglitz, representing the appellants, Laurel Management, Advanced Weight Loss, Minimally Invasive Surgical Associates. I'd like to reserve five minutes for rebuttal, if I may. The fundamental issue before the Court today is whether a medical provider can ever assert its own common-law claim against an ERISA entity based on the provider's direct interactions with that entity. The District Court essentially held that they cannot, relying on an overly broad reading of this Court's 1991 decision in Cromwell. Cromwell, in its very language, does not support such a holding. But even before getting to this very important point, it is perhaps more important to understand that the 1991 Cromwell decision was at a disadvantage in its definition of the words relate to, which predated the 1995 Supreme Court's decision in Travelers. In Aldridge, members of this panel specifically identified the change in the Supreme Court's application of the words relate to, discussing the change from broad reading in MetroLife to a more narrow interpretation in Travelers. Cromwell specifically relied on MetroLife and the broad reading of relate to in coming to its decision. Because Cromwell is anchored to at least an insufficient and potentially obsolete standard, this panel could rightly conclude that Cromwell has been superseded by Supreme Court precedent. But the panel need not do that today. You do not need to overturn Cromwell, because Cromwell itself explicitly carved out the exact claims we're bringing here. In footnote three of that opinion, the court stated that its preemption holding was expressly premised on the absence of any legal duty between the plan and the provider. But it seemed otherwise to be the exact same scenario. It's hard for me to see how that kind of opaque footnote would really carve out claims that they found preempted. Weren't they even the same claims in some sense? Well, there wasn't the specificity. And it was very terse and cursory in terms of there was this claim based on an assignment. So there's that whole interaction that relates to the ERISA benefits claim that existed there that they were trying to assert. And so that sort of colored the whole analysis. And in terms of the analysis relating to the preemption, very terse, very quick. And the only real detail in terms of the facts of the case, it seems to only fall into that footnote three, where they sort of discuss the relationship between the parties and what was trying to be accomplished. And ultimately, that there was no independent duty asserted in those allegations. And so that's why the footnote three seems to me to be the most important aspect vis-a-vis this particular case. And there are other things that went on in Cromwell. But in terms of the conflict preemption analysis, I think that footnote three is essential. I would have thought Cromwell was actually an easier, or this case is an easier case for preemption. Because here we have an extant plan about which representations were made. And in Cromwell, I mean, the plan had been extinguished with respect to the terminated employee. Here, I mean, as I understand your first amended complaint, and it differs from the second amended complaint, I think, in pretty key ways. Okay. Is that there were oral promises made over the phone about the coverage of the plan and the payment mechanism. If the promises are about the plan, then how does that not relate to the plan? Absolutely. If the promises were about the plan, then that probably would be about the plan. Then we'd probably have to assert a, to the extent that we even could, because we, and we couldn't. We allege in the pleadings that we can't, that there is, that we believe there's an anti-assignment provision. Actually, in fact, if you look at the docket, I've never even seen a copy of the plan. The plan's not part of the record. We're not seeking anything based on the terms of the plan. And the court can put the plan aside when doing, the district court could, but the plan completely aside, never look at the plan based on the way that we are going to proceed in this case, or we intended to proceed in this case, is that there were representations made. It's very similar to some of the sister court decisions that we cite to, where, like an access, where you have this call. They represent they're going to pay UCR. UCR is very commonly, the data source that's commonly used for UCR is FairHealth. We'd look at the FairHealth data, which is available to the public, and then you'd simply use the information that's provided in that call to determine whether or not, what the rights are. And if we can't prove our case based on that information alone, then we lose. If you have to go, that, we say you don't need to look at the plan. You never have to look at the plan. I understand that my. It sounds like a breach of oral contracts. Like, I might be with you if the operative complaint had a breach of an oral contract claim in it, but it doesn't. It has negligent misrepresentation and promissory estoppel, both of which are premised on like a new or should have known allegation, and I take it that the reason they should have known that the coverage was either going to be excluded or that the payment was going to be reduced is because of the plan. Is that wrong? It's not. It's wrong because of the sense that it doesn't need. There doesn't need to be a plan for that to be the case. They could still know. They can still know what they're in their mind. You take that you take. I mean, I guess the plan in that sense, you might refer to the plan, but there's there's most of the theory of misrepresentation. I thought was they were misrepresenting because they knew or should have known the plan foreclosed this avenue of payment is part one. Part two is under your theory. Then how do you get lazy boy into the case? We also have two questions. So I guess there's two answers. So there's also a promissory estoppel claim. So I think that was alleged in the original complaint that wouldn't need any misrepresentation necessarily. But I also think that a misrepresentation doesn't necessarily you don't need that. You don't need the plan document to say necessarily that we don't need to necessarily look at the plan documents. Oh, well, they were wrong. You can simply look at the document. They ultimately produce later and show, OK, what was the payment? So they paid based on Medicare, which is what we allege. Then you can see that they misrepresented it to you. Again, I don't even know what the plan says. I've never even seen a copy of the plan. I'm sorry. I forgot the court's second question. The second question was, well, how do you get lazy boy? Because it's based. So there is there is an insurance card. The insurance card also is not part of the plan. I don't even think I don't. There's an insurance card that's provided to the doctor's office upon the patients coming there. And it's only based on that insurance card, which identifies it identifies both Blue Cross Blue Shield of Michigan. And it also identifies lazy boy in that insurance card as being potentially related to it. Why would why would lazy boy be bound by statements of employees of Blue Cross? Because you're negligent. I could I could I could understand if the court wanted to say perhaps that that lazy boy shouldn't be included in. I think that I think that I think that based on the insurance card, it seems to me and based on my experience in this area, is that ultimately the lazy boy is still the payer of whatever or whatever this is. I suppose the theory that I would have come up with is that is there a principal agency relationship? That's what we would say. That's what we would. That's what we would say based off of the based off of the limited information that we have based on the insurance card. And and that's that's the reason why we pleaded the way that we pleaded. It's because we understand based on that insurance card to indicate that Blue Cross Blue Shield is is the agent. And lazy boy is perhaps the principal. But that's because of the plan. No, it's not. It doesn't. I mean, the plan could be. So, for example, there's a case in the Ninth Circuit called Meadows. And you actually mentioned here with crumble, the plan already was gone, was gone by that point in time. It's possible the plan, the plan is possible plan doesn't exist anymore. I don't even know. Again, I don't even have a copy of the plan. So this is just based off of the imperative information that we're given at that particular point in time. Whether ultimately there is a plan, whether any of those things are irrelevant to the particular claim that we're going to that we that we would like to pursue. How can I ask you? I was very curious about Judge Herman. The first question about what is the applicable negligence standard? So you have to known or should have known that you was a misrepresentation. So that means it is a misrepresentation. And then how do you determine whether it was a misrepresentation? Well, the court could find the misrepresentation claim is preempted, but then find that the promissory stoppel claim is not preempted. And then similarly, we also were foreclosed from even making an attempt at an amended complaint. And the reason why we actually presented an amended complaint to the to the district court was to show the court. See, we can. There is something that we could present which would not be preempted by ERISA potentially. And so we that's why we put forth that amended complaint. So we do have causes of action that we if the court says the negligent misrepresentation claim is preempted, then there's we still would like to pursue the promissory stoppel claim and the breach of oral contract claim. Do you think that the rule should be if you have to look at the plan and interpret the plan provisions, then it should be preempted? And if you can come up with a theory where you don't have to do that, then it should not be. So from my reading of like a whole line of the cases, whether it be from from the Sixth Circuit cases, a whole line of the cases is it seems to me that the analysis is that if you if you're ultimately getting, you're really seeking plan benefits and you clearly need to look at that plan document, then then probably it's preempted. But if you don't need to look at the plan, if you're only so there's. I think that that might apply even to your I recognize your theory about why promissory stoppel is independent. I get it's based on the oral representation. Right. But the funds ultimately are going to come from Blue Cross and presumably Blue Cross might say, hey, these are going to be funds that are coming out of the plan. But it could be different. So that's so it could. So the funds that are ultimately going to be paid. First of all, the doctors have no rights under the real edge. The doctors have no rights. I got that. So don't you think Blue Cross will if they're forced to pay for this oral representation, that they'll somehow be like, lazy boy, your plans are going to have to pay this now. But that wouldn't fall under any of the it wouldn't fall under any of the tests of the Sixth Circuit puts forth. It wouldn't that that doesn't that's not something that's not changing. It's not altering the way in which it's fiduciary. I mean, it has a fiduciary obligation to Lazy Boy to manage the plan assets appropriately. If it's going out and making oral representations unsupported by the plan that it then has to pay out. Doesn't that implicate the relationship, the fiduciary relationship Blue Cross has with Lazy Boy? It might implicate that. I don't know what they're. I don't have a copy of whatever their whatever their their internal documents are amongst themselves. Their own complaint alleges that they're responsible for providing administrative services relating to patient and defendant's health plan, which that's the allegation that were deleted before the second amended complaint. So that that's that sort of creates that's the idea that it would create the agency relationship. It potentially would create the agency relationship. Again, I don't think that that alone there's I don't think that that alone there's a lot of cases. There are a lot of cases that we cite to that seem to say that that alone would not implicate just that. Even even looking at that much of the plan, which I don't think we even need to do. But even even doing that would not implicate a preemption analysis. It wouldn't it wouldn't lead to a conflict, a conflict preemption situation. I think that alone is not it wouldn't be sufficient. But but even but even still, as I say, again, and then the court could also do that as well. The court could say that the claims are preempted as to Lazy Boy, but they're not preempted as to Blue Cross Blue Cross Blue Shield of Michigan. I think that we simply want to be able to pursue our claim and be able to. Somebody made a representation, a representation to our clients, which we relied upon to our detriment. And we want to be paid for that. So. OK, thank you. Good morning. Matthew McConnick on behalf of dependent defendant Napoli Lazy Boy. This court held in Cromwell that state law causes of action that effectively seek to recover benefits under an ERISA plan are preempted. That is because those types of claims go to the heart of what ERISA was trying to exclusively regulate. And that's exactly what plaintiffs claims here. Can I I'm trying to figure out what the rule should be here for. It seems like plan administrators often contract with other parties to implement a plan. And I am troubled by the notion that there would be no recourse to those other parties. I also think it would actually hurt ERISA plans because no one would be willing to contract with them. So do you think if say just assume that the second amended complaint was before us and there was a or just just take a hypothetical. There's clearly a written contract between a plan and medical providers saying like, hey, we'll pay you on these certain rates. And then and then assume that there's a dispute about what those rates are. Do you think that that would be preempted? So let me let me answer that in two different ways, Your Honor. I think one is if you're talking about non-medical provider service providers, that's addressed. And there's an important distinction that was drawn in the 2005 case by this court in the Pony case. Yeah, I got that. So why is this so suggest that those types of contracts shouldn't be preempted? So so that case that case dealt with a essentially a records provider for the plan. And in that case, there was a bank that was a fiduciary service provider. And so that that entity was part of the ERISA scheme. And so their claims were were part of a risk on any state law claims outside of that were preempted. Then there was a non-fiduciary service provider that had an explicit contract, not for the provision of medical services, but for the provision of record keeping services. And the court found that those claims were not preempted because there was a separate contract that didn't have anything to do with the plan. And that's because the action that was brought by that, you know, the action that was brought against that service provider weren't wasn't for the recovery of plan benefits, effectively for the recovery of plan benefits. And that's why this case is fundamentally different, because here what. But what do you mean by the recovery of plan benefits? Because the service provider. I mean, if you if you mean that the plan benefits will be used to pay for the breach of contract, you can arguably say that it was going to at least affect the plan benefits. It was for a recovery of the damages that flowed out of the breach. But this is expressly stated in the First Amendment complaint that the measure of damages is the difference between the amount that was paid when a claim was submitted under the plan for the provision of plaintiffs medical services. The difference between that and what plaintiffs alleged was promised to them by Blue Cross as the administrator of the plan. So the damages explicitly that are sought by plaintiffs in the First Amendment complaint are for benefits that they thought should have been paid out under the plan based on Blue Cross's alleged representations. I think I understand the other side's point that you don't even need to look at the plan. It's based on the benefits promised to be paid, at least under the promissory estoppel theory. So that's why I do. So what is your answer to my hypothetical that if there was a dispute over a contract between a medical provider and a plan administrator over the amount to be paid for claims, if there was a dispute over that separate contract, that it would be preempted or not? It sounds like you think it would be. So if we're talking about non-medical providers, I think that's a different situation. If we're talking about medical providers, I think that those would still be part of the plan, I would think, right? So if that's true, then medical providers just simply cannot contract with plans. They're unenforceable because they have no benefit under ERISA, right? There's no cause of action under ERISA in which a medical provider could sue for breach of contract for this separate contract. So it's not the plan. It's the separate contract. So the mechanism would be that the patient would bring claims under? No, the patient doesn't care. The patient got treatment. And the plan is refusing to pay the medical provider pursuant to this third contract or this whatever you want to call it, separate contract. And the medical provider is claiming that there was a breach because in the contract it was promised one thing and they were given another. Right. And I think the situation here is different, which I'll get to in a minute after I answer your question, Your Honor. But in that scenario, what often happens is that either the patient assigns their claim to the medical provider and the medical provider proceeds directly under ERISA. Or if there was some sort of non-assignment provision, the medical provider could proceed against the patient and the patient could proceed against the plan. But the patient didn't breach. I mean, don't lots of plans contract or at least lots of insurers. That's why we have preferred providers or whatnot. And it just strikes me as extreme. It would be like a no rule of law zone if we say preemption gobbles up everything that administrator does with third parties. I think this is a different scenario here because precisely because of the allegations in the first amended complaint, which are all specific to the plan. The allegations in the first amended complaint are not that there was some sort of oral contract independent of the plan. It's expressly alleged that there was an explicit discussion regarding things like what was the out-of-pocket maximum? So you think if it was intentional fraud, that would preempt it too? So change the hypothetical to devious insurers start telling out-of-plan providers that they'll cover knowing full well they won't because it's not covered by the plan. And the providers rely on that representation and then try to seek payment. And then there's no recourse because it's preempted under your theory, even if it's intentional fraud. Well, I think there is no intentional fraud claim here. I'm just saying the implications of your argument are there is just it's a law free zone between plan administrators and third parties who help patients. I don't think that's the case, Your Honor. And I think. So what would the remedy be for that? That intentional fraud? Well, I would say there wouldn't be any remedy as to my client. I'm not talking about your clients. In your view, would the patient is always ultimately on the hook for the provided services? Is that your theory that if the plan were to act in the way Judge Murphy suggested, the patient would still be technically on the hook to pay, but then would have recourse perhaps under ERISA to recover the damages from this breach of fiduciary obligation on the plan's part? I think the patient, without understanding exactly what the patient's contractual relationship is to the providers, I would say in most cases, probably the patient is on the hook to the providers and the providers would have a contract claim against the patient that would either allow them to get an assignment from the patient of claims, or if that were not allowed to proceed against the patient, have the patient proceed under ERISA through the ERISA process under the plan. I think footnote three of Cromwell that plaintiff's counsel spoke to also speaks to this issue, because footnote three talked about how in that case the medical providers did no sort of background diligence, didn't ask to look at the plan, didn't ask to look for proof of insurance. That's something that the providers could have done here, could do in other cases to determine whether or not and make themselves feel comfortable that there actually is coverage and that they would be able to get an assignment from the patient. And so, you know, absent that, what the Supreme Court precedent, what this court's longstanding precedent, both in Cromwell and in numerous cases, post travelers that reaffirmed that court holding in Cromwell regarding claims that effectively seek to recover planned benefits through state law causes of action being preempted. All of those cases remain good law and remain at the heart of ERISA preemption. And I see that my time is up, so. Thank you. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Nathan Sherberth on behalf of the Blue Cross Blue Shield of Michigan. I'm happy to just jump right into questions. If we go to Judge Murphy's hypothetical, just imagine that instead of what happened in this case, what happened was someone from Blue Cross Blue Shield signs a one-page contract to provide the same services to the patient here for, let's say, like a flat fee of $300,000 or something like that. I think that is a different situation. Do you think that is not preempted? I don't think that Cromwell necessarily preempts it. I don't think that there's a clear answer to that, frankly. To be perfectly frank, the standards set forth by the Supreme Court, which is just related to, in connection with, is amorphous. But that's not before us here. Why is the rule of law different? The one theory that I could see that unifies everything, I totally agree with the assignment cases, that if a provider is simply asserting a participant's rights, that that should be preempted, because you basically stand in the shoes of the participant and you should be suing under ERISA. But why wouldn't the test be, is it an independent claim of the participant? By which I mean, it can exist independent of the plan and the contractual terms of the plan. That breach of contract, I would say, is independent because it's a separate contract. And I would think that tort principles could be seen as independent because they, just as there's contractual duties, there's tort duties. They're just duties established by law rather than by agreement. And here, the tort duty, well, I guess promise to restopple is kind of weird. I don't even know what theory it is. But it is an independent duty in the sense of it arises from a promise that is independent of the plan. And we don't even need to look at the plan. We just need to look at the promise and ask if the promise was kept. So I think, as a general matter, I don't think that all, if there's a separate contract, I think that's a very, very different question. And I don't think that Cromwell or Travelers or any of these other cases necessarily preempts that, necessarily holds that preemption applies there. Because, again, the ultimate source of the obligation here is the ERISA plan. It would be the duties imposed by law by a state, by state common law. So the fraud example would be just the duty not to commit fraud, which exists independent of any plan.  And I think that the, again, the test is very amorphous. I don't think that there's a clear answer. I agree with you. I think in this case, Cromwell controls. It's not very helpful for us to decide the cases, just to say the test is amorphous. Sure, sure. But I think in this case, Cromwell clearly controls. If you look at the allegations of the first amended complaint, which is what's before this court, the second amended complaint is not before this court. The first amended complaint is all premised on, we called to determine what was available under the plan, and we don't think we were paid enough under the plan. And brother counsel talks about, well, we can just ignore the plan. They wouldn't have been calling if there wasn't a plan. They're asking what's available under the plan. This is exactly the same claims as Cromwell. We're talking about promissory estoppel and we're talking about misrepresentation based upon a call that was made to determine what services were available. And the reality is they could have asked for the plan if they weren't satisfied. If they didn't know what they could get under this plan for this treatment, they could have gone and asked for the plan. They didn't. They provided apparently $340,000 worth of treatment, and they were not satisfied with how much they were paid. And at the end of the day, that all relates to it's connected with the ERISA plan. I think it's a lot different question if there were intentional fraud or something like that alleged. I think that would, I don't think that that necessarily would be preempted because you have to balance the, you know, the common law intentional tort versus, you know, the preemption, the scope of preemption under ERISA. Do you take their promissory estoppel theory to be a promise about the plan's repayment terms? I do, and that's based upon the, you know, their allegations are that, you know, they're a stop from changing what the plan pays because of what we asked about the plan. We asked what the plan was going to pay, and they should be a stop from not paying what the plan would pay. But the plan paid a certain amount and, you know, and they're stuck with that. So it's not necessarily like a freestanding promissory estoppel claim where you say you promised you would remit, you know, $300,000 on this surgery. It was you promised you would pay UCR under the terms of the plan. You promised this was not an excludable surgery under the terms of the plan. Right. Okay. And that's a fundamental distinction too. Some of these cases are talking about independent promises. You know, some of the cases that Brother Counselor relies on from other circuits are talking about independent promises under separate contracts. Here, it's all under the plan. The plan paid some money. I think that's a critical point here. They're not saying, you know, the plan didn't pay anything. The plan paid. The plan paid what was required under the plan. They're not happy with that. That's the essence of the claims in Cromwell, and there's really no basis to depart from that. Now, I did want to talk briefly about Travelers. The idea that Travelers somehow overruled Cromwell, I don't think it did. I mean, Travelers is talking about a surcharge statute, you know. But it adopted a new analysis. So, you know, we now have a two-part test it has to either refer to or be in connection with. I don't know that Cromwell applied that test. Whether Cromwell applied that test or not, that certainly applies here. It's in connection with the plan. All these allegations are we have a plan and we're seeking payment under that plan. And it refers to the plan repeatedly in this complaint. The complaint is riddled with allegations related to the plan, whether, you know, Brother Counsel would like to say that these are independent or not. I mean, again, if there were an oral contract that, you know, they said that they would pay X amount unrelated to the plan, maybe that's a different story, but that's not what we have here. Sorry, one last one. Does Blue Cross have authority to bind Lazy Boy outside its plan, its relationship as plan administrator? No, this is all based upon plan administration. Thank you. Just wanted to touch on some of the things that my colleagues on the other side made points to. I don't think there's any reference anywhere in the First Amendment complaint or the Second Amendment complaint of the words under the terms of the plan. I don't think we ever say that we're seeking UCR under the terms of the plan. I think those words were superimposed by my colleagues on the other side, and I don't think it's a fair representation to say that at any point in time we were seeking benefits under the terms of the plan. Also, I want to point out something that the court was, I think, determined or was getting to, was we could ultimately go to the patient and seek, we could ultimately, the doctors could ultimately go after the patient. But I think Lordman talks about this and some other many cases talk about that ERISA did not want that. That's not what the point was. The point of ERISA was not, and I think plastic surgery talks about this in the Third Circuit, where it would be counterintuitive for because, let's say, because of the fact that the doctors cannot seek any payment from the insurance company, that the doctors would have to go sue the patient. That wouldn't serve the purposes of ERISA. And so that's not what ERISA was contemplating. That's not what the Congress was contemplating when it did it. And so that shouldn't be a reason for why in Judge Murphy's or in your examples of where you have a contract case, that shouldn't be a reason why you should ultimately say, oh, well, these cases are all preempted, because you still are ultimately able to go sue the patient, and that makes it all OK. I agree with the same conversation that happened with the patient in Blue Cross Blue Shield, that if the patient tried to sue under the common law, that would be preempted. I agree. Absolutely. Why is that? Because they have a right. They have their right under the plan. The plan in Lordman talks about this. I usually have the quote ready at hand, but it says specifically, and I'm paraphrasing, patients were given rights under ERISA. Doctors were not given any rights under ERISA. And that's why Lordman came out the way that it did. The patients have those rights under ERISA, and they're pretty good. I've asserted some of them in a lot of cases that I've done to great success, and the patients have those rights. And so they're able to go and proceed and be able to assert those rights. Doctors don't have any of those rights, and that's why in Lordman they said, yeah, these claims are not preempted. And that sort of piggybacks onto the point, which they say, oh, well, they could have asked for a copy of the plan. I don't know if I literally just did a case in front of the Ninth Circuit where the judges asked, why didn't you give them a copy of the plan? I got penalties and fees for that because we literally asked for months and months during the appeals on an ERISA case, and we asked for a copy of the plan, and we didn't get a copy of the plan. It's not so easy to get a copy of the plan. And isn't that like assumption of risk on your part? You did a rather expensive surgery without fully – Well, that's why we do the phone call. So the call is – that's basically – it's our lynchpin to say, okay, well, we have this claim that we're going to be able to – we have something we're going to rely upon. That's the whole point. It's not an assumption. If it's fully independent of the plan, then why did you get paid under the plan? Well, we submitted a claim. We're supposed – it's still – you're still – you're supposed to – I mean, ultimately, that's the money. That is – again, I don't know for a fact. I haven't traced the dollars to the accounts and all of that, but the money may have come out of the plan. It may have come out of plan assets. I couldn't tell you, but – The reliance on the phone call in some respects strikes me as a gotcha. I mean, you asked for $340,000, and – Well, I don't – On the assumption of risk point, I think if you're going to provide services for that amount of money, I would want more assurances than just calling some random person that I don't even know if you – I don't think it's a gotcha, and you say $340,000. We don't – I don't think – we don't allege that we're – well, that's ultimately the total bill, but the amount that we're seeking is the UCR amount. The UCR amount could ultimately be $50,000. It could ultimately be $75,000. I didn't print out the fair health data for these specific procedure codes and provide them, but the UCR number could be – it could be less. It's not a gotcha. This is part of the industry and the business. They don't have to provide the phone calls. They don't have to pick up the phone. They don't have to answer the phone. They could say, well, we don't have that information. We're not trying to play gotcha. We're just trying to be able to know what we're getting ourselves into. The doctors are trying to be able to know what they're getting themselves into before they actually do the services. So they make the phone call. They ask the questions. Sometimes they make more than one phone call. They may have even made more than one phone call in this particular instance. I don't know that we've plugged that, but that's the whole point. That is their link. They don't have anything else, especially if a plan has an anti-assignment provision. What's your response as damages point, that the measure of damages is the difference between the plan coverage and what you received? So that connects to the negligent misrepresentation argument, the point that the court mentioned. Again, as Judge Murphy mentioned, we don't need to look at the plan. We never need to look at the plan. The damages are calculated based on what that UCR amount is in the industry. We look at fair health data. We take that fair health number, or I would contend it's a fair health number, and we subtract the max out-of-pocket representation that was made on the phone call. Because, again, I don't even know if it's correct. I don't even know if it's in the plan. We subtract that amount, and that's the amount that we believe that we were owed from the beginning. Great. Thank you. Thank you. Well, the case will be submitted. I think this is our last case, so the clerk can adjourn court.